**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

In re Blackrock Burr Ridge, Inc.,

        Debtor.

        Bankr. No. 17-33456

        Chapter 7

        Judge Jacqueline Cox

Michael K. Desmond, not individually but as
Chapter 7 Trustee for the Bankruptcy Estate of
Blackrock Burr Ridge, Inc.,

        Plaintiff,

        v.

        Adversary Proceeding No. 19-00686

Norah Sheehan and Joseph Sheehan,

        Defendants.

**Memorandum Opinion and Order**

On November 8, 2017, a petition for chapter 7 bankruptcy relief was filed on behalf of the

Debtor, Blackrock Burr Ridge, Inc. ("Blackrock" or "Debtor"). Adversary Proceeding No. 19-

00686 was filed therein by Chapter 7 Trustee Michael K. Desmond ("Trustee") on May 7, 2019.

Pursuant to 11 U.S.C. §§ 544, 548 and 550 of the Bankruptcy Code, as well as the Illinois

Fraudulent Transfer Act, the Trustee seeks to avoid and recover from Norah Sheehan and Joseph

Sheehan ("Defendants," "Norah" and "Joseph") and any other entity for whose benefit certain

transfers were made, transfers that were made up to ten years before the petition date.

The Trustee also seeks to disallow any claim that the Defendants may assert against the

1

Debtor pursuant to section 502(d) of the Bankruptcy Code which provides that "the court shall disallow the claims of any entity from which property is recoverable under Bankruptcy Code sections 542, 543, 550 or 553 . . . or that is a transferee of a transfer . . . unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable." 11 U.S.C. § 502(d).

### Jurisdiction

The court has jurisdiction over proceedings arising under title 11 or arising in or related to cases under title 11 pursuant to 28 U.S.C. § 1334. The District Court for the Northern District of Illinois has referred the bankruptcy cases filed therein to the Bankruptcy Court for the Northern District of Illinois. Northern District of Illinois Operating Procedure 15(a).

Actions to recover fraudulent transfers do not arise exclusively under the Bankruptcy Code and do not strictly arise in bankruptcy cases in that they can be prosecuted under state law in state court. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(E) and (H). This court is exercising related to jurisdiction, raising the question of whether there is a constitutional barrier to the entry of final judgment. However, any barrier to the entry to final judgment may be overcome by the knowing and voluntary consent of the parties to final adjudication by a bankruptcy judge. *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669, 684 (2015) ("Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express."). Neither the Plaintiff nor the Defendants have objected to the entry of a final judgment by this court.[1]

---

[1] Federal Rule of Bankruptcy Procedure 7008(a) requires that a complaint in an adversary proceeding contain a statement that the pleader does or does not consent to entry of final orders or judgment by the bankruptcy court. Federal Rule of Bankruptcy Procedure 7012(b) states that a responsive pleading shall include a statement that

## Background

Blackrock was a real estate development company whose principal project was the construction of a medical office building in Burr Ridge, Illinois. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law ("PPF"), Docket 174, ¶ 4; Norah Sheehan's Proposed Findings of Fact and Conclusions of Law ("Norah's Proposed Findings"), Docket 175, ¶ 4. Norah Sheehan is and has been, since 2007, a fifty percent shareholder of Blackrock. Joint List of Stipulated Facts ("Stipulation"), Docket 159, ¶ 6.

Bernard Sheehan was and is a fifty percent shareholder of the Debtor. Trial Transcript vol. 5, 620, December 13, 2023.[2] Joseph Sheehan is Norah Sheehan's husband. Stipulation, Docket 159, ¶ 7. Bernard is Norah's son. Trial Transcript, vol. 5, 621.

We know from the testimony of Attorney Daniel Tarpey, who represented Sterling Bay Companies and its affiliates throughout this saga, that in 2009 Blackrock entered into a venture with the Sterling Bay Companies, LLC ("Sterling Bay") for the development of the medical center. Exhibit 37, p. 2; Trial Transcript vol. 2, 170, 193. Blackrock and Sterling Bay entered into a series of agreements, culminating in the December 1, 2009 Operating Agreement of Sterling Blackrock, LLC. Exhibit 37, at 6-7; Trial Transcript vol. 2, 192.

Construction of the facility was completed in 2011; it was sold to Duke Realty in 2012.

---

the party does or does not consent to entry of final orders or judgment by the bankruptcy court.

[2]The trial of this matter was heard over five days.
Trial Transcript volume 1 covers testimony heard on November 28, 2023. Docket 164.
Trial Transcript volume 2 covers testimony heard on November 29, 2023. Docket 165.
Trial Transcript volume 3 covers testimony heard on November 30, 2023. Docket 166.
Trial Transcript volume 4 covers testimony heard on December 5, 2023. Docket 167.
Trial Transcript volume 5 covers testimony heard on December 13, 2023. Docket 168.
The number(s) after the volume is (or are) the page number(s) in the transcript.

Trial Transcript, vol. 5, 633. A dispute arose in connection with the sale. Blackrock sued the Sterling Bay entities and their principals on September 2, 2011 in the Circuit Court of Cook County, Illinois in Case. No. 11 L 9199. Exhibit 22 at Sheehan 000205.

Blackrock asserted that it was owed a minimum distribution of $650,000 and a profit percentage distribution of $1.447 million. Trial Transcript vol. 5, 680-681; Exhibit 22 at Sheehan 000206.

Before Blackrock filed the state court case Sterling Bay put it on notice that Blackrock could be obligated to Sterling Bay for legal fees if the litigation ensued and Sterling Bay prevailed. Trial Transcript vol. 2, 226, 288-290. Sterling Bay wrote a letter outlining the contents of the relevant documents that governed its relationship with the Debtor. The Debtor was told that although the Sheehans might have not been happy with the terms of the documents, they had agreed to them. They were also told why the documents did not justify the payment they were seeking. The Debtor was put on notice that if it continued to pursue the litigation, Sterling Bay was going to set off that profit percentage distribution to obtain its legal fees. They filed the lawsuit in spite of this warning. *See* Sterling's Counterclaim for legal fees, etc., filed on November 20. 2013, Exhibit 22, Bates Stamp Sheehan 0366; Trial Transcript vol. 2, 220-240.

On January 3, 2014, Judge Tailor approved the Escrow Motion, ordering Sterling Bay to deposit Blackrock Burr Ridge's "Profit Distribution Proceeds" in the amount of $1,447,900 (plus interest) with the Clerk of the Court. Stipulation, ¶ 8, Docket 159.

On January 21, 2016, Judge Tailor ordered the release of $1,447,900.90 plus accrued interest payable to the Debtor, Blackrock Burr Ridge, and its attorneys, Kreamer Law Group. Stipulation, ¶ 9, Docket 159.

4

On January 27, 2016, the Clerk of the Circuit Court of Cook County issued check number 1605 payable to Blackrock Burr Ridge, Inc. and Kreamer Law Group, LLC in the amount of $1,458,060.35. Stipulation, ¶ 10, Docket 159.

On February 2, 2016, the check was deposited into account number x6689 ("Blackrock's Account") at Grand Ridge National Bank and owned by the Debtor, Blackrock Burr Ridge, Inc. Stipulation, ¶ 11, Docket 159.

On February 2, 2016, the Kreamer Law Group Group was paid funds from the Debtor's account totaling $103,000. Stipulation, ¶ 12, Docket 159. On February 9, 2016, the balance of the check proceeds, $1,355,060.35, was transferred from Blackrock's account to account number x2375 also held at Grand Ridge National Bank and owned jointly by Joseph and Norah Sheehan. Stipulation, ¶ 13, Docket 159.

When the Debtor received the check from the Court Clerk, Bernard Sheehan, the Debtor's president, realized that a trial date was approaching in less than a month. Trial Transcript vol. 3, 524. On February 17, 2016, Norah made a payment to Grand Ridge National Bank on mortgage loan number 767. Stipulation, ¶ 14, docket 159. On February 17, 2016, Norah made a payment to Grand Ridge National Bank on mortgage loan number 7882. Stipulation, ¶ 15, Docket 159.

In a January 23, 2016 letter the Debtor's attorney, John C. Kreamer, advised the Defendants and Bernard Sheehan of a potential settlement offer: Sterling Bay had proposed to walk away from the suit and the counterclaim and not proceed with the request for legal fees. Ex. 16 at 1.

Attorney Tarpey testified that on September 6, 2016, the court entered an order granting a directed finding against the Debtor and in Sterling Bay's favor on the Debtor's Count II (breach

of fiduciary duty); the court entered judgment in the Defendants' favor on both remaining counts of Debtor's complaint, concluding the trial of the state court case. Ex. 10 at 35; Trial Transcript vol. 2, 242.

The transfer to Norah and Joseph depleted the corporate bank account and left Blackrock with nothing that could be used to pay creditors. Trial Transcript vol. 2, 312.

The transfer occurred within two years of the bankruptcy case's petition. Stipulation, ¶ 16, Docket 159. Norah is an insider of the Debtor and one of its directors. Stipulation, ¶ 17, Docket 159; Exhibit 12. Norah was a shareholder of the Debtor and was a recipient of the Transfer. Stipulation, ¶ 18, Docket 159. As a relative of Norah, her husband, Joseph C. Sheehan is also an insider. *See* 11 U.S.C. § 101(31)(B) for the Bankruptcy Code's definition of an insider.

On April 5, 2017, Tarpey Wix LLC, as counsel for Sterling Bay Companies, LLC and others, filed a Supplemental Memorandum in Support of Petition for Attorneys' Fees. It requested judgment against the Debtor of $1,152,406.64 consisting of fees of $1,097,187.70 and $55,218.83 in expenses. Stipulation, ¶ 19, Docket 159. On May 25, 2017, Judge Budzinski entered a judgment awarding the defendants their attorneys' fees and costs in the amount of $1,152,406.64. The judge denied plaintiffs' petition for attorneys' fees. Stipulation, ¶ 20, Docket 159.

There are two types of fraudulent transfers: those made with actual intent to hinder, delay and defraud creditors and those made under circumstances that constitute constructive fraud. Transfers found to be constructively fraudulent need not be based on fraudulent intent; they are referred to as fraud in law and are based on a debtor's transfers made without consideration or for inadequate consideration. *Society of Lloyd's v. Collins*, 284 F.3d 727, 730 (7th Cir. 2002).

The Adversary Complaint filed herein on May 7, 2019 has seven counts:

Count I:  Avoidance of Transfer under 11 U.S.C. § 548(a)11)(A) - alleging actual fraud under the Bankruptcy Code;

Count II: Avoidance of Transfer under 11 U.S.C. § 548(a)(1)(B) - alleging a constructively fraudulent transfer under the Bankruptcy Code;

Count III: Avoidance of Transfer under 11 U.S.C. § 544 and section 160/5(a)(1) of the Illinois Uniform Fraudulent Transfer Act - alleging an actual fraudulent transfer under Illinois law;

Count IV: Avoidance of Transfer under 11 U.S.C. § 544 and Illinois Fraudulent Transfer Act §§ 5(a)(2) and 6(a) - alleging a constructively fraudulent transfer under Illinois law.

Count V: Recovery of Avoided Transfer under 11 U.S.C. § 550(a).

Count VI: Unlawful Distribution under Illinois Business Corporation Act §§ 8.65 and 9.10; and

Count VII: Disallowance of Claims under 11 U.S.C. §§ 502(d) and 502(j).

**Count I - Avoidance of Transfer under 11 U.S.C. § 548(a)(1)(A)**

The Trustee has to show that the transfer in question was of the Debtor's interest in property made within two (2) years of the filing of this bankruptcy case where the Debtor made the transfer with intent to hinder, delay or defraud any entity to which the Debtor was indebted or to which the Debtor became indebted after the date of such transfer.  The Trustee has shown by a preponderance of the evidence that the February 9, 2016 transfer from the Debtor to Norah and Joseph's joint bank account was made to hinder, delay and defraud the Debtor's creditors

The Joint Stipulation shows that the transfer in issue was made on February 9, 2016.

7

Stipulation, ¶ 13, Docket 159. That date was within two years of the filing of this bankruptcy case on November 8, 2017. The Defendants were reminded of the Sterling Bay entities' demand for legal fees. *See* January 23, 2016 letter to the Defendants from the Debtor's attorney, John C. Kreamer. Ex. 16. On May 17, 2017 Judge Budzinski entered judgment awarding Sterling Bay its legal fees and costs in the amount of $1,152,406.64; the Judge denied the Debtor's petition for legal fees. Stipulation, ¶ 20, Docket 159.

The main issue in dispute is whether the transfer was made by the Debtor to Norah Sheehan and Joseph Sheehan with intent to hinder, delay or defraud existing or future creditors. Because this count (and count IV under Illinois law) requires proof of the Debtor's intent which is difficult to get a Debtor or a defendant to admit, courts developed bridges from questionable acts commonly associated with fraud to findings of actual fraudulent intent. These "badges of fraud" are indicia of transactions imbued with fraud; they are circumstantial evidence of a debtor's state of mind. Badges of fraud include:

> (1) the lack or inadequacy of consideration;
> (2) the family, friendship or close relationship between the parties;
> (3) the retention of possession, benefit or use of the property in question;
> (4) the financial condition of the party sought to be charged both before and after the transaction in question;
> (5) the existence or cumulative effect of the pattern,"or series of transactions or course of conduct after incurring the debt, onset of financial difficulties, or pendency or threat of suits by creditors and
> (6) the general chronology of events and transactions under inquiry.

*See* 5 R. Levin & H. Sommer, COLLIER ON BANKRUPTCY § 548.04[1][b][ii] n.16 (16th ed. 2024) for a discussion of badges of fraud.

In *In re MCK Millenium Centre Parking, LLC* this court noted that "[b]ecause a defendant will rarely admit that it intended to defraud creditors, actual intent may be proved by

8

circumstantial evidence, commonly referred to as 'badges of fraud." 532 B.R. 716, 752 (Bankr.

N.D. Ill. 2015).  Those badges of fraud include:

> (1) whether the debtor was insolvent at the time of transfer or became insolvent as a result of the transfer;
> (2) whether the debtor retained control of the asset;
> (3) whether the transfer was to a family member;
> (4) whether the transfer was prior to the debtor incurring a substantial debt;
> (5) whether the transfer was substantially all of the debtor's assets;
> (6) whether the debtor received consideration for the transfer;
> (7) whether the transfer was disclosed or concealed;
> (8) whether the debtor made the transfer before or after being threatened with suit by creditors; and
> (9) whether the debtor absconded.

*In re MCK Millenium Centre Parking, LLC*, 532 B.R. 716, 732 (Bankr. N.D. Ill. 2015) (citation

omitted), *vacated on reconsideration on other grounds*, No. 12 B 24676, 2015 WL 13817636

(Bankr. N.D. Ill. Sept. 10, 2015).

The Defendants' primary defense is that the transfer to their joint bank account was a loan

repayment, i.e., that Blackrock received consideration in the form of a $2,000,000 loan from

Norah.  They submitted paper ledgers as evidence of the loan.  *See* Exhibit 41.  Those documents

do not include a signature of the borrower, the Debtor, as required by the Debtor's bylaws.  In

addition, the Debtor's board did not pass a corporate resolution authorizing any loans.  Norah

testified at the December 13, 2023 hearing that Sterling Bay owed the money to the Debtor,

which funds the Debtor was obligated to pay her.  No documents were disclosed in support of

this part of her testimony.  She admitted that there were no loan documents showing that the

Debtor owed her monies. Trial Transcript vol. 5, 739-740.  No documents were produced at trial

documenting transfer(s) of loaned funds from Norah to the Debtor.

The Debtor's bylaw requires that its board authorize such loans.  There is no board

resolution authorizing the Debtor to borrow funds from Norah.

Bernard Sheehan, the Defendants' son, was the Debtor's 50% shareholder and its president. Even though he is a business consultant, he knew very little about the Debtor's operations and transactions.

The court finds that the Debtor intentionally transferred $1,355,060.35 to the joint account owned by Norah Sheehan and her husband Joseph with intent to hinder, delay and defraud creditors the Sterling Bay entities and their law firm, Tarpey Wix, who warned and reminded Norah and the co-owner of the bank account, her husband Joseph Sheehan, and their son, Bernard Sheehan, that it would seek payment from the Debtor of its legal fees and expenses incurred in defending the lawsuit where Sterling Bay eventually prevailed on all counts. Joseph and Norah constantly testified that they knew nothing about the Debtor's transactions. Their testimony was unbelievable as they were sufficiently sophisticated to develop a medical facility. Joseph and Norah denied knowledge of the warnings from Sterling Bay's attorney that were transmitted via letter to their attorney. That does not absolve them. The information sent to their attorney, their agent is imputed to them. *Washington v. Parkinson*, 737 F.3d 470, 473 (7th Cir. 2013) (citation omitted) ("[A]n attorney is the agent of her client and an agent's knowledge is imputed to her principal."). The court finds that the Defendants knew everything about the Debtor's transactions both personally and through their attorneys.

The most compelling evidence is Norah Sheehan's 2018 deposition testimony that she did not loan funds to the Debtor during the development project. After this fraudulent transfer case challenged the transfer to their joint bank account she defended by stating that she had loaned the Debtor $1.9 Million during the development project and that the transfer to her was a

10

loan repayment. The ledger documents that supposedly reflected the "loan" are unconvincing. The court finds that Norah did not loan the Debtor any funds.

The Trustee argued at his opening argument that at no point have the Defendants produced bank statements showing that $1.9 Million went into the Debtor's account(s). Trial Transcript vol. 1, 14-19. The Trustee also argued that the funds the Sheehans invested in the project were returned to them when a refinancing occurred. *See* Attorney Daniel Tarpey's testimony that the Debtor's loan from the Ango Irish Bank was satisfied from refinancing proceeds and that the Sheehans were reimbursed for hard costs that brought value to the deal such as the down payment for the land, debt service and interest. That amount was $927,000. They were also paid $175,000 for approved reimbursements and $137,500 for a development fee. Trial Transcript vol. 2, 205. This has not been disputed. Instead, the Sheehans have posited that Norah is owed $2,000,000 for a loan not documented in tax returns or personal financial statements and not approved by a board resolution.

The Debtor's tax returns do not show that its owners held a debt that the Debtor owed. *See* Exhibit 1, p. 4, line 19, which has a blank line on the Debtor's 2014 tax return where information should have been included showing the Debtor was liable to a shareholder for a loan.

In fact, the Debtor's 2014, 2015 and 2016 tax returns do not reflect any obligations on the Debtors behalf to pay a loan from Norah. Exhibit 30 at pp. 44-109. Each return's Schedule L includes a line for "Loans from Shareholder." No loans were disclosed.

Norah testified at the trial herein that a tax return for the Debtor did not reflect that it owed her for a loan. Trial Transcript vol. 1, 141-142. The Trustee also argued that no loans to the Debtor were noted in Personal Financial Statements submitted by Norah and Joseph Sheehan

11

in connection with the project. Exhibit 30, pp.14-16 is a Personal Financial Statement authored by the Joseph and Norah on May 7, 2014. On the third page where Accounts and Notes Receivables were to be reported, the line is blank. The court finds that no loan was reported because no loan was owed. The court finds that the transfer to the Defendants' joint bank account was not supported by documents showing any consideration to the Debtor. The court finds that no consideration flowed to the Debtor at any time in exchange for the funds transferred to the Defendants.

The Trustee posited in his attorney's opening argument that the Debtor's bankruptcy case was filed right after citations to discover assets were filed following the judgment awarded to the Sterling Bay for its legal fees. Trial Transcript vol. 1, p. 16.

The Sheehans were warned about Sterling Bay's position that it had a right to attorneys' fees if it prevailed in the unwarranted lawsuit filed by the Debtor. Letters regarding the unwarranted lawsuit were sent and Sterling Bay filed a counterclaim for fees in 2013. Plaintiff's Proposed Findings of Fact and Conclusions of Law, ¶ 21; Exhibit 22, Sheehan 366.

Oddly, the Defendants' son Bernard Sheehan, the Debtor's president, testified that he knows very little about the transactions in issue. He did not know if his mother paid legal fees at various times even though this was supposedly the basis of the funds alleged to have been loaned by her to the Debtor. He claimed to not know that his sister Fran had paid the Debtor's lawyers $20,000. He recalled very little about the lawsuit filed by the company even though he was its president.[3] He could not even recall whether he ever received a paycheck from the Debtor. Trial

---

[3] The Trustee is suing Bernard Sheehan for the same issues in a separate adversary proceeding, *Desmond v. Bernard Sheehan*, Adversary Proceeding No. 22-00181.

Transcipt, vol. 3, 479. Nor could he recall whether his mother stopped putting in funds after Sterling Bay got involved. *Id.,* at 487. He could not recall how much money she put in. *Id.,* at 488. He was not sure if his sisters put in funds. *Id.*

Bernard testified that if Sterling Bay had lived up to their bargain they would not have incurred legal fees. He acknowledged, however, that the Debtor sued them, forcing Sterling Bay to pay a million dollars in legal fees to defend itself. *Id.,* at 512-513. He knew they were trying to recover their legal fees. *Id.,* at 513.

Bernard unconvincingly disavowed knowledge of the January 23, 2016 letter from the Debtor's attorney informing the Defendants and him of the settlement offer: Sterling Bay was willing to walk away from the suit and counterclaim and not proceed with its request for legal fees or challenge the Debtor's retention of the $1,447,990.90 that had been released to the Debtor by Judge Tailor. *Id.,* 515-523.

Bernard was asked at trial if the Debtor's bylaws required its board of directors to pass a resolution authorizing it to borrow money. Trial Transcript vol. 5, 671-674. His answers were equivocal:

> Q. So, the corporate bylaws prohibited Blackrock Burr Ridge from taking out any loan unless it was authorized by a resolution of the board of directors, correct?
> A. Well, that - - I suppose. I mean, to me this looks like it is pretty standard language. Like this would have just been, you know, been printed from – you know – What is the terminology? Just what it is kind of standard stuff.
> Q. Boiler plate?
> A. Boiler plate.
> Q. Did the board of directors ever pass any resolution authorizing the company to take on debt?
> A. We took on debt from the get-go with the purchase of the property. That was – we moved ahead with that. We were in the process of that when ths was being formed.

13

Trial Transcript vol. 5, 672-675.

Bernard assumed that a resolution was passed. *Id.*, at 673. He finally responded that he did not know. *Id.*

Exhibit 12 is a copy of the Debtor's corporate bylaws. They were signed by both Norah Sheehan and Bernard Sheehan as directors of the Debtor. Section 5.02 of the bylaws states that:

> No loans shall be contracted on behalf of the corporation and no evidence of indebtedness shall be issued in its name unless authorized by a resolution of the board of directors. Such authority may be general or confined to specific instances.

Exhibit 12, Section 5.02.

No such resolution was presented at the trial of this matter. The court finds that the Debtor's board of directors did not issue a resolution authorizes it to borrow funds from Norah Sheehan.

The Sheehans received the funds deposited into their joint bank account without having extended a loan to the Debtor. In addition, they had already received a return on their investment at the refinancing.

Norah's 2018 deposition is Sheehan's Exhibit 7. It was taken on September 20, 2018 by the Plaintiff, the Trustee. She testified at the trial herein and there that she was asked to produce loan documents but did not produce any because there was no loan. Trial Transcript vol. 1, 66. Her 2018 deposition testimony reflects at page of 32 she was asked for loan documents and said there were none and "Blackrock Burr Ridge didn't owe me the 1.9." Trial Transcript vol. 1, 69. She also said there that Sterling Bay owed her the $1.9 million. Note also that she said at the deposition that the Debtor had no creditors. Deposition, Defendants' Exhibit 7, p. 29. Norah said she did not write a check to the Debtor. She got a line of credit and Bernard took care of the

14

funds. Trial Transcript vol. 1,74-76. However, no records of the amounts alleged to have been loaned were presented at trial. She does not know what happened to a list of amounts that were taken regarding the line of credit. *Id.*, at 76-77.

According to Norah, there was no mortgage on her house before she took out a line of credit and that those funds were used to start the project; however, she did not know whether she produced such records. Trial Transcript vol. 1, 82. Norah also testified that she was not involved with the company when she gave the deposition; she said she never went to the company. *Id.*, at 95.

Norah also said that Bernard probably prepared the purported loan documents (Exhibit 30, pp. 4-7: the ledgers). Trial Transcript vol. 1, 123. However, Bernard testified that he did not remember how they were prepared. Trial Transcript, vol. 3, 504.

Irish American Bank may have been a lender on the real estate according to Norah. Trial Transcript vol. 1, 113-114. She does not know when she signed the documents at Exhibit 30, pp. 4-7. She did not know if she signed them all at one time. *Id.*, at 124.

Exhibit 30 includes Norah and Joseph's 2014 Personal Financial Statement that does not include as an asset a claim (a loan) against the Debtor. Trial Transcript vol. 1, 134, 139; Exhibit 30, pp. 14-16.

Debtor's 2016 tax return does not show a loan from a shareholder. Trial Transcript vol. 1, 141-142; Exhibit 3, pp.1-11, Schedule L, line 19. That document does not show that the debtor owed her $600,000, the balance that would be due her after she received the $1,355,060.35: $1,458,060.35 minus $103,000 paid to the law firm.

She was in Ireland when the check came in and when the law firm was paid. Trial

15

Transcript vol. 1, 146. When asked if she knew Sterling would seek its fees she said, "Oh, I guess so." *Id.*, at 149. She claims not to have known Sterling counterclaimed/sued the Debtor. *Id.*, at 149-50. Interestingly, she got bills from the lawyer but not the letter discussing the settlement offer that Sterling was willing to walk away from the case. *Id.*, at 152.

When Sterling Bay's attorney Mr. Tarpey first got involved with the dispute Sterling Bay had with Blackrock Burr Ridge, Dr. Joseph Sheehan was the point person on behalf of Blackrock. Trial Transcript vol. 2, 172. Dr. Sheehan participated in negotiations and appeared at depositions and court hearings. According to Mr. Tarpey, Dr. Sheehan was involved more heavily in the matters herein than others in the Sheehan family. *Id.*, at 172-173. This makes sense and is more credible than Dr. Sheehan's statements to the contrary. Dr. Joseph Sheehan was named as Blackrock's corporate representative regarding a deposition. *Id.*, at 174.

Blackrock's problem in getting the project completed in a timely manner was that its president, Bernard Sheehan, lacked experience as a developer. *Id.*, at 174-75.

The Sheehans had trouble getting the medical center built. Before they partnered with Sterling Bay they had two other development partners: the Missner Group and Cogdell Spencer. *Id.*, at p. 175. Those partnerships devolved into litigation, too. Mechanic's liens lawsuits were filed.

When Sterling Bay got involved the Sheehans had spent $2 Million on the project; by their own admission, they had nothing to show for it. *Id.*, at 176.

When the Debtor's creditor Anglo Irish Bank threatened to foreclose on the project Sterling Bay made sure the debt got paid upon financing. *Id.*, at 190-92.

Sterling Bay and the Debtor agreed that Sterling Bay would receive an 80% membership

interest in the Burr Ridge Medical Center. Blackrock Burr Ridge would receive a 20% membership interest. An entity known as Camillus Burr Ridge Medical Center obtained a 10% membership interest from Blackrock Burr Ridge, leaving Blackrock Burr Ride with a 10% membership interest. *Id.*, at 193. When Camillus' agent Mr. Walter Viola expressed dissatisfaction with various matters Sterling Bay convinced the Sheehans to purchase Viola's interest to avoid another round of litigation. That was done. That was paid from the financing that was arranged to complete the project. According to Mr. Tarpey, Camillus' interest was bought with $350,000 from the Sheehans and $150,000 from Sterling Bay even though only Blackrock Burr Ridge received Camillus' 10% interest: Sterling Bay received no portion of Camillus' interest. *Id.*, at 195-96.

To obtain a financing commitment from the Crown family and to avoid tax problems, the project had to reorganize and become Blackrock Burr Ridge Medical Center II ("BRMC II"). Sterling Bay, as Sterling Blackrock, invested $1 Million; the Sheehans did not contribute funds at that point. Sterling Bay became a 50% member in BRMC II. *Id.*, at 199-202.

Sterling Medical secured $20.5 Million from TCF National Bank. *Id.*, at 204. The Crown family invested $10 Million. *Id.*, at 219. The Anglo Irish Bank debt was paid and the Sheehans were reimbursed for the costs they incurred on the project in the approximate amount of $927,000 plus $175,000. The Sheehans were also paid $137,500 as a development fee. *Id.*, at 205-207. Those payments reimbursed the Sheehans: to "pay back the Sheehans for money they had contributed that brought value to the deal." *Id.*, at 208. The Sheehan's attorneys were paid $115,000 to avoid litigation over that issue. *Id.*, at 209.

Once the Sheehans realized the building was to be sold they sued Sterling Bay. They

17

sought but were not granted a preliminary injunction to halt the sale; the sale proceeded. *Id.*, at 210. The Sheehans were due their profit percentage distribution. Approximately $1.4 Million was put into a court escrow account in response to Sterling's request. *Id.*, at 210-211. The Sheehans had been told to expect $1,386,611 from the sale. *Id.*, at 211.

The Sheehans requested between $1.8 Million and $2 Million. *Id.*, at 215. After Sterling Bay got involved no further funds were required from the Sheehans. *Id.*, at 216.

Sterling Bay/Sterling Medical counterclaimed in the lawsuit filed against it by the Sheehans. The counterclaim sought, pursuant to the relevant agreements, attorneys fees as a prevailing party. Their agreement allowed them to deduct funds for that purpose from the amounts due the Debtor. *Id.*, at 221. The Debtor's claims were considered unwarranted. *Id.*

Prior to the Debtor filing suit, the Sheehans received a letter explaining the relevant agreements and documents. Although the Sheehans might not have been satisfied by the ensuing events, they had agreed to the terms and were shown that their demands were not justified. Sterling Bay asked the state court to hold the funds in issue; that request was granted. *Id.*, at 221-225. The court finds that the Debtor and the Sheehans were on notice that they could be liable for the Sterling Bay entities' legal fees. Their attorney, Mr. Kreamer, sent Mr. Tarpey a demand letter. Mr. Tarpey's letter in response noted why the June, 2011 refinance did not justify a minimum distribution and why their position was flawed. He informed that if they persisted, reimbursement for legal fees would be sought. *Id.*, at 230.

In September of 2016, the state court ruled in favor of Sterling Bay on all of the Debtor's claims; at that point the claim for reimbursement for legal fees and expenses became concrete. The court found that the Debtor was not entitled to a minimum distribution. *Id.*, at 243. The

Debtor was entitled only to a profit percentage distribution. *Id.*, at 250. The problem is that a different judge had already released the escrowed funds on January 21, 2016 before the case was finalized. *Id.*, at 246. The state court found that Sterling Bay/Sterling Medical was the prevailing party, entitled to recover its legal fees and costs, awarding it $1,152,406.64. *Id.*, at 250-252.

Because the funds were transferred to Norah and Joseph on February 9, 2016 and Sterling's judgment for fees and costs was obtained in May 2017, the Defendants argued that they had no idea they would face such a judgment. That argument carries no weight because the Defendants and their attorney were on notice of Sterling's claim since the counterclaim was filed in 2013. In any event, a transfer can be found to be a fraudulent transfer and subject to avoidance even when the transfer occurs before a debt gets incurred.

The court finds that the funds contributed to the project before Sterling Bay got involved were investments or capital contributions, not a loan. Courts are allowed to place the proper label on claims, examining them for their substance, not their nomenclature. *Gecker v. Flynn (In re Emerald Casino)*, 2015 WL 1843271, at *8 (Bankr. N.D. Ill. April 21, 2015) ("Whether a particular transaction is a loan or capital contribution determines whether it qualifies as a 'claim' under the Bankrupty Code or as an interest; the equitable authority to characterize loans as equity is, therefore, 'necessary to enforce the Code' and falls within the bankruptcy court's equitable authority under § 105.") (citations omitted). Since no loan has been documented and the Sheehans were reimbursed for the costs incurred in getting the project off the ground, those reimbursements were a return on an investment.

The $1,447,900.00 deposited into the account was the profit percentage distribution the

Debtor was entitled from the sale of the real estate to Duke Realty. Trial Transcript vol. 2, 282.

The court finds that the Debtor was told many times about Sterling's claim. Trial Transcript vol. 2, 290. The court finds that when the Debtor transferred the funds in issue to Norah Sheehan and Joseph Sheehan, Bernard Sheehan, its president, their son knew about Sterling's claim for its legal fees. In addition, the court finds that when the transfer is issue was made, the Debtor had no funds left to pay creditors.

At the time of the transfer the lawsuit (and counterclaim for legal fees) was pending. The Debtor was not required to stop doing business, but, if it was insolvent, it owed a duty to its creditors, not just its shareholders. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec,* 529 F.3d 371, 384 (7th Cir. 2008) ("In general, the officers and directors of a corporation do not owe fiduciary duties to creditors of the corporation. But in special circumstances such as insolvency, directors do owe a duty to creditors.") (internal citation omitted).

Norah Sheehan said she had a right to take the money. The court disagrees. The funds that had been invested were repaid when the refinancing was done. The Trustee noted that she did not file a proof of claim attaching documents showing that she was owed $1.9 Million. After taking the $1,355,060.35 she would have been owed an additional $600,000. No proof of claim has been filed on Norah's behalf.

The Trustee has shown that the Debtor was insolvent before and after the transfer in issue was made. The Bankruptcy Code defines the term insolvent as: "with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of property transferred,

20

concealed, or removed with intent to hinder, delay, or defraud such entity's creditor . . ." 11 U.S.C. § 101(32). The Debtor had $100 in its main bank account before it received the $1.447,900.00 in 2016. It transferred that entire amount to its lawyer and to Norah Sheehan and Joseph Sheehan soon thereafter, leaving it with $100 in the face of Sterling Bay's counterclaim for legal expenses. The court finds that its debts exceeded its assets.

The Seventh Circuit recently ruled on insolvency in the context of fraudulent transfer analysis in *In re International Supply Co.*, 103 F.4th 478, 481 (7th Cir. 2024), where a bankruptcy judge ruled that a debtor was insolvent after it diverted its assets to pay its principal's debts. In that case the bankruptcy judge "concluded that International Supply was insolvent in August 2013, because its income, having been diverted to Hofmann, was unavailable to keep its business afloat and repay its debts." *Id.* The Seventh Circuit rejected a creditor's position that insolvency had to be established on a balance-sheet basis. The Seventh Circuit noted that Illinois law states that a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation and that a debtor who is generally not paying his debts as they become due is presumed to be insolvent. *Id.*, at 482 (citing 740 ILCS 160/3(a) and (b)). Blackrock Burr Ridge had $100 on hand when it faced potential liability for its opponent's legal fees and expenses, making it insolvent as its potential debts exceeded its assets. Alternatively, it was insolvent because we know the Debtor was not paying its lawyers and court reporters bills as those bills became due.

Joseph has said he had little to do with the business. However, he signed an affidavit saying he was a shareholder in the state court case. That document states that Bernard Sheehan was his business partner. Trial Transcript vol. 3, 363-365. In addition, he admitted to being one

of the Debtor's principal decision makers. *Id.,* at 366. The court finds that Joseph C. Sheehan was familiar with the Debtor's business affairs.

Joseph testified that in January, 2016 he was not sure he knew of Sterling's request for legal fees. Trial Transcript vol. 3, 399. He claimed at trial that he was not sure who the Debtor's lawyer was talking to in a letter the lawyer sent about the matter. *Id.* The court finds that as one of the Debtor's principals, Joseph Sheehan is bound by the lawyer's acts as the lawyer is the Debtor's agent. *Washington,* 737 F.3d at 473. Notice from the lawyer to the Debtor's principals is notice to each of them, Joseph Sheehan, Norah Sheehan and Bernard Sheehan. The letter was addressed to all of them. Exhibit 16, a letter dated January 23, 2016.

When asked if the Debtor was paying all of its bills Joseph testified that the only bill not paid was Sterling's. However, their lawyer's June 9, 2015 email seeking payment to it and to other vendors was introduced into evidence. Trial Transcript vol. 3, 403-406; Exhibit 52. The court finds that the Debtor was not paying all of its bills in the 2015-2016 period.

### Analysis

In Count I herein the Trustee seeks to avoid the February 9, 2016 transfer of $1,355,060.35 from the Debtor's bank account to the joint bank account of the Defendants Norah Sheehan and Joseph Sheehan pursuant to 11 U.S.C. § 548(a)(1)(A), the Bankruptcy Code's actually fraudulent provision, i.e., that the transfer was made within two years of the filing of the bankruptcy petition with actual intent to hinder, delay or defraud any entity to which the debtor was or became indebted on or after the date that such transfer was made.

The Trustee has shown each element by a preponderance of the evidence. The transfer was of the Debtor's interest in property within two years of the petition date. The several badges

of fraud show that the transfer was made with actual intent to delay, hinder and defraud its creditors. *In re Veluchamy*, 524 B.R. 277, 307 (Bankr. N.D. Ill. 2014) ("The trustee must prove the elements of a fraudulent transfer action - including the amount of any damages - by a preponderance of the evidence.") (citations omitted), *recommendation to District Court adopted* 551 B.R. 364 (N.D. Ill. August 18, 2015 No. 15 CV 2075), *aff'd* by *In re Veluchamy*, 879 F.3d 808 (7th Cir. 2018). As the court explained above, the badges of fraud denote the Debror's state of mind. Several badges of fraud (bridges to fraud) have been shown. They are the fact that the Debtor was left insolvent when the transfer was made; the lack or inadequacy of consideration in that there was no loan extended by Norah Sheehan justifying repayment; the family or close relationship between the Debtor and the recipients, the parents of its president; the transfer was prior to the Debtor incurring a known debt to Sterling Bay; the transfer was of substantially all of the Debtor's assets and the transfer was made after the Debtor was threatened with suit (and the actual filing of the counterclaim in 2013) by Sterling Bay.

The February 9, 2016 transfer to Defendants Norah Sheehan and Joseph C. Sheehan is avoided pursuant to 11 U.S.C. § 548(a)(1)(A). The court awards the Trustee judgment on Count I in the amount of $1,355,060.35 with interest.

In Count II the Trustee requests avoidance of the transfer under the constructively fraudulent provision of the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(B). There the Bankruptcy Code allows the avoidance of a (1) a transfer of the debtor's property where (2) it occurs within two years of the filing date, (3) for which the debtor received less than a reasonably equivalent value in exchange for the transfer and (4) the debtor became insolvent at the time of the transfer. *Grochocinski v. Reliant Intractive Media Corp. (In re General Search.com)*, 322 B.R. 836, 842

23

(Bankr. N.D. Ill. 2005).

The Trustee alleged and has shown by a preponderance of the evidence that when the Debtor made the transfer of the property in which it had an interest within two years of the petition date, it received less than a reasonably equivalent value in exchange for it as Norah Sheehan had not loaned it funds as she said at the 2018 deposition. The Trustee has also shown that the Debtor was insolvent on the date of the transfer as before the transfer the Debtor had only $100 in the account and after the transfer it had only $100 therein; its debts exceeded its assets. The Trustee has also shown that the Debtor was insolvent as it was not paying its creditors as its bills became due, including bills from its lawyers and a court reporting entity. The court finds that the Debtor made the transfer in exchange for zero consideration because no loan had been extended to it and that it became insolvent when it transferred the funds to Norah Sheehan and Joseph C. Sheehan's joint bank account.

In Count III the Trustee seeks avoidance of the transfer under section 544 of the Bankruptcy Code and section 160/5(a)(1) of the Illinois Fraudulent Transfer Act. The Trustee alleges there that the February 9, 2016 transfer occurred within four years of the petition date, that it was of the Debtor's interest in property and that the transfer was made with actual intent to hinder, delay or defraud existing and/or future creditors. Count III also alleges the existence of several badges of fraud: the transfer was to insiders - Norah and her husband, the Debtor was insolvent at the time of the transfer or became insolvent shortly thereafter and that the Debtor did not receive reasonably equivalent value for the transfer.

Section 544 of the Bankruptcy Code allows a trustee to avoid transfers under non-bankruptcy law. It "vests the trustee with the ability of a judgment lien creditor to attach or seize

both tangible and intangible property transferred by a debtor to a third party prior to filing for bankruptcy . . . " *Alberts v. Tuft* (*In re Greater Se. Cmty. Hosp. Corp.*), 333 B.R. 506, 520 (Bankr. D.D.C. 2005).

Federal law and Illinois law on fraudulent transfers are essentially identical as Illinois has adopted the Uniform Fraudulent Transfer Act ("UFTA") which was enacted to reflect federal bankruptcy law. The Seventh Circuit Court of Appeals has noted that the UFTA reflected an effort to harmonize state law with the Bankruptcy Code. *Leibowitz v. Parkway Bank & Trust Co.* (*In re Image Worldwide, Ltd.*), 139 F.3d 574, 577 (7th Cir. 1998) ("However, as its title indicates, the UFTA is a uniform act, and it derived the phrase 'reasonably equivalent value' from 11 U.S.C. § 548(a)(2). . . . [W]e can look to interpretations of 'reasonably equivalent value' from § 548 cases, as well as cases from courts interpreting other states' versions of the UFTA for assistance in predicting what an Illinois court would do.")

The Illinois Fraudulent Transfer Act ("IFTA"), 740 ILCS 160/5(a)(1), states that a transfer is fraudulent as to a creditor whether the creditor's claim arose before or after the transfer was made (1) if the debtor made the transfer with actual intent to hinder, delay or defraud any creditor of the debtor, or (2) it was made without receiving a reasonably equivalent value in exchange for the transfer. The Illinois provision states that in determining actual intent consideration may be given to several factors which are essentially badges of fraud, including whether the transfer was to an insider, whether the debtor retained possession or control of the property transferred after the transfer and whether before the transfer was made the debtor was threatened with suit. 740 ILCS 160/5(b). The statute of limitations for causes of action pursuant to IFTA section 160/5(a)(1) (actual intent to hinder, delay or defraud) and (a)(2) (without

receiving reasonably equivalent value) is four years.  740 ILCS 160/10(a) and (b).

The Trustee has shown by a preponderance of the evidence that he can recover under section 5(a)(1) of the IFTA.  The court incorporates herein its remarks under Count I, the Bankruptcy Code's actual fraudulent transfer provision.  Recall that the Bankruptcy Code and the Illinois Fraudulent Transfer Act are very similar.  The transfer was made by the Debtor with intent to hinder, delay and defraud the Debtor's creditor Sterling Bay when the February 9, 2016 transfer was made.   Judgment is entered in favor of Trustee Michael Desmnd and against Defendants Norah Sheehan and Joseph Sheehan.  The $1,355,060.35 transfer is avoided pursuant to Count III.  Trustee Desmond is awarded a monetary judgment of $1,355,060.00 with interest against Defendants Norah Sheehan and Joseph Sheehan.

In Count IV the Trustee seeks to avoid the transfer under the Illinois fraudulent transfer law as a constructively fraudulent transfer.  That count is plead in the alternative: under sections 5(a) and 6 of the IFTA.  *See* 740 ILCS 160/5 and 740 ILCS 160/6.

Section 5(a)(1) makes a transfer by a debtor, whether a creditor's claim arose before or after a debt was incurred, fraudulent if it was made without receiving a reasonably equivalent value in exchange for the transfer and the debtor was (A) engaged or about to engage in a business for which the remaining assets of the debtor were unreasonably small in relation to the business or (B) intended to incur debts beyond his ability to pay as they became due.

Section 6 states that a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange and the debtor was insolvent at that time or became insolvent as a result of the transfer.

The Trustee has shown by a preponderance of the evidence that the transfer was constructively fraudulent under IFTA section 5(a). The transfer was made before the debt was incurred when the Defendants knew that Sterling Bay had made a claim for its legal expenses. The Debtor was not loaned funds by Norah Sheehan, meaning the transfer to her and Joseph was in exchange for nothing, the transfer was made without receiving a reasonably equivalent value. The Debtor was engaged in business with remaining assets of only $100, which was unreasonably small in relation to the size of Sterling Bay's claim. In addition, the Debtor, with the knowledge of its principals, intended to incur debts beyond its ability to pay as they became due.

The Trustee has satisfied the elements of section 6. The court finds that the transfer was made before Sterling Bay's claim became concrete, it was made without the Debtor receiving a reasonably equivalent value in exchange and the Debtor was insolvent at that time in that it was not paying its bills as they became due and was rendered insolvent as a result of the transfer.

The transfer is avoided pursuant to sections 5(a) and 6 of the IFTA. The Trustee is awarded a judgment against Norah Sheehan and Joseph Sheehan in the amount of $1,355,060.35 with interest on Count IV.

In Count V the Trustee seeks to recover the avoided transfer pursuant to 11 U.S.C. § 550(a) of the Bankruptcy Code which allows a trustee, after avoiding a transfer under Bankruptcy Code section 544, 547 and 548 to recover the property transferred or the value of the property transferred from the initial transferee or the entity for whose benefit the transfer was made. The Defendants Norah Sheehan and Joseph Sheehan were the initial transferees of the transfer: the funds in issue were transferred by the Debtor to the Defendants' joint bank account. Having

avoided the transfer, the Trustee is now entitled to recover the funds from the Defendants who received the funds directly from the Debtor on February 9, 2016.

The court awards the Trustee a money judgment on Count V against Norah Sheehan and Joseph Sheehan in the amount of $1,355,060.35 with interest, representing a full recovery of the property transferred to them.

Count VI alleges that section 9.10 of the Illinois Business Corporation Act ("IBCA") provides that an Illinois corporation may not issue a distribution to shareholders "if, after giving it effect: (1) the corporation would be insolvent or (2) the net assets of the corporation would be less than zero or less than the maximum amount payable at the time of distribution to shareholders having preferential rights in liquidation if the corporation were then to be liquidated." 805 ILCS 5/9.10(c)(1).

Section 8.65 of the Illinois Business Corporation Act provides that "directors of a corporation who vote for or assent to any distribution prohibited by Section 9.10 of this Act shall be jointly and severally liable to the corporation for the amount of such distribution." 805 ILCS 5/8.65(a)(1).

The Trustee has shown by a preponderance of the evidence that the transfer made the Debtor insolvent; for that reason it was prohibited by section 9.10(c) of the IBCA. Norah Sheehan was a shareholder and director who assented to the distribution under section 8.65 of the IBCA by accepting the deposit of the $1,355,06035 check and using those funds to pay other obligations. Norah is liable to the corporation, now represented by its bankruptcy estate, for the amount of the transfer. Recall that Exhibit 12 is the Debtor's bylaws which Norah Sheehan signed as both a shareholder and a director of the Debtor.

28

Judgment is entered on count VI in favor of the Trustee and against Norah Sheehan in the amount of $1,355,060.35 on Count VI.

Count VII seeks disallowance of claims under 11 U.S.C. §§ 502(d) and 502(j).

Section 502(d) of the Bankruptcy Code states that the court shall disallow any claim of an entity from which property is recoverable under section 542, 543, 550, or 553 of the Code or is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548 unless such entity or transferee has paid the amount or turned over any such property for which such transferee is liable under sections 522(i), 542, 543, 550, or 553 of the Code.

Bankruptcy Code section 502(j) states that a claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case. The Trustee asks in Count VII that the court disallow any claims held by any of the Defendants against the Debtor until they return the transfer to the Trustee.

Examination of the Claims Register discloses that neither Norah Sheehan nor Joseph Sheehan has filed a proof of claim herein. Because neither Defendant has filed a proof of claim herein, there is nothing to disallow until the transfer gets repaid. For that reason judgment will be entered against the Trustee and in favor of the Defendants Norah Sheehan and Joseph Sheehan on Count VII.

### Conclusion

The court enters judgment in favor of the Trustee Michael K. Desmond on Counts I, II, III, IV and V as follows:

The February 9, 2016 transfer to Norah Sheehan and Joseph Sheehan is avoided. Judgement is entered in favor of Plaintiff Trustee Michael K. Desmond and against Defendants

Norah Sheehan and Joseph Sheehan in the amount of $1,355,060.35 with interest.

On Count VI judgment is entered in favor of Trustee Michael K. Desmond and against Norah Sheehan in the amount of $1,355,060.35 with interest.

Judgment is entered in favor of Defendants Norah Sheehan and Joseph Sheehan and against Plaintiff Michael K. Desmond on Count VII.

Although the Trustee Michael K. Desmond has been awarded $1,355,060.35 (with interest) on several counts herein only one recovery of that amount will be allowed.

ENTER: _____

Chief Judge Jacqueline P. Cox
U.S. Bankruptcy Court
Northern District of Illinois

**Date**: July 25, 2024